IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JENNIFER L. SKAGGS, | ) | CASE NO. 3:16-cv-01200 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Jennifer L. Skaggs ("Plaintiff" or "Skaggs") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner")

denying her applications for social security disability benefits.  Doc. 1.  This Court has

jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate

Judge pursuant to the consent of the parties. Doc. 13.   As explained more fully below, the

Administrative Law Judge's reasons for discounting Skaggs' credibility are not supported by the

record and/or are not sufficiently explained to allow this Court the ability to determine whether

the credibility assessment is supported by substantial evidence.  Accordingly, the Court

**REVERSES and REMANDS** the Commissioner's decision for further proceedings consistent

with this opinion.

## I.  Procedural History

Skaggs filed applications for Disability Insurance Benefits ("DIB") and Supplemental

Security Income ("SSI") on February 13, 2013.  Tr. 136, 247, 251.  She alleged a disability onset

date of September 1, 2005, (Tr. 136, 247, 251), but later amended her alleged onset date to July

20, 2011 (Tr. 36, 136).   Skaggs alleged disability due to fibromyalgia, rheumatoid arthritis,

neuropathy, lumbar radiculopathy, carpal tunnel syndrome, hand numbness, polyneuropathy, DDD, diabetes mellitus – type 2, sciatica, vertigo, obesity, and depression.  Tr. 71, 157, 174, 271.  Skaggs' applications were denied initially (Tr. 157-172) and upon reconsideration by the state agency (Tr. 174-185).   Thereafter, she requested an administrative hearing.  Tr. 186.  On November 13, 2014, Administrative Law Judge Yvette N. Diamond ("ALJ") conducted an administrative hearing.  Tr. 33-70.

In her December 19, 2014, decision (Tr. 133-154), the ALJ determined that Skaggs was not under a disability within the meaning of the Social Security Act from July 20, 2011, through the date of the decision (Tr. 149).  Skaggs requested review of the ALJ's decision by the Appeals Council.  Tr. 21.  On March 21, 2016, the Appeals Council denied Skaggs' request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-7.

## II. Evidence

### A.      Personal, vocational and educational evidence

Skaggs was born in 1974.  Tr. 38, 147, 247.   At the time of the hearing, Skaggs was 40 years old.  Tr. 38.  She was divorced with two adult children, ages 21 and 22.  Tr. 38.  She lived in a house with her two children.  Tr. 38.  She weighed 285 pounds and was 5 feet tall.  Tr. 38.  Skaggs graduated from high school and attended college but she did not complete one full year of college.  Tr. 39, 272.

Skaggs' past work included self-employment as an in-home daycare provider.  Tr. 40.  She performed that work from 2004 to 2010.  Tr. 40.  Skaggs performed the in-home daycare work herself, having a maximum of six children in her care at a time.  Tr. 40.  From 2005 until 2007, the age ranges of the children in her care were 3 months up to 11 years old.  Tr. 40-41.  In 2009 and 2010, Skaggs only cared for older children.  Tr. 41.  She was unable to care for babies

and toddlers because she was unable to pick them up. Tr. 41. She stopped her in-home daycare work in 2010. Tr. 40. After Skaggs stopped working as an in-home daycare provider, she applied for one cashier job. Tr. 43.

Prior to her in-home daycare work, in 2002, Skaggs worked as an assistant supervisor in a pre-school for 3-year olds. Tr. 41. Prior to the pre-school work, Skaggs also worked as a sales clerk/stock clerk/cashier in a toy store and as a mortgage loan representative. Tr. 42-43.

**B.      Medical evidence**

**1.      Treatment history**

Skaggs is an obese woman (Tr. 410, 419) who seeks disability based on her multiple medical conditions. Since 2005 through at least 2014, Skaggs has been diagnosed with and treated for various conditions, including urinary problems (Tr. 368-405, 541-543, 546, 625), diarrhea (Tr. 429-431, 456-458, 469, 477-480, 482-483, 485-486, 544-545, 546, 573-578), heartburn (Tr. 544-545), rheumatoid arthritis (Tr. 356, 490-503, 505, 555-556, 594-602), fibromyalgia (Tr. 356, 419, 431, 504, 506, 551-552, 555, 579-593, 594-602), diabetes mellitus, type II (Tr. 540, 552, 555-556), back and leg pain (Tr. 406-428, 504, 514-516, 536, 553, 571-572, 579-593, 603-611, 626-627), sensory loss/neuropathy  (Tr. 504, 537-539, 540, 603-611, 625-632), foot pain (Tr. 540, 623-624), speech difficulty (603, 606, 607), and depression (Tr. 485-486, 489, 552, 555-556).   In 2013 through the first part of 2014, Skaggs lost her medical insurance coverage and could not afford medical treatment, including medications. Tr. 47-48, 102, 282, 289, 297, 517, 527.

## 2. Opinion evidence

### a. Physical impairment medical opinions

*Consultative examining physician's opinion*

On May 6, 2013, Marsha D. Cooper, M.D., saw Skaggs for a consultative evaluation. Tr. 517-525. Skaggs' daughter was with her at the visit. Tr. 519. Skaggs complained of heartburn, swollen legs, her fingers getting stuck sometimes, aches in her body all the time, urinary and fecal incontinence, and low back pain. Tr. 517. Skaggs indicated she had been off of her medication since January because her child had turned 18 years old and she lost her medical card, which was really the reason why she was applying for disability. Tr. 517. On examination, Dr. Cooper observed that Skaggs was "very obese, short statured female, [and] somewhat theatrical." Tr. 519. Dr. Cooper's examination of Skaggs' spine revealed a negative straight leg raise, loss of lordotic curve, and no gross deformities. Tr. 519. There was no cyanosis, clubbing or edema in Skaggs' extremities and Skaggs' pedal pulses were good at 3/4. Tr. 519. There were no effusions, redness, heat or gross deformities observed in Skaggs' bones/joints. Tr. 519. Dr. Cooper also observed that Skaggs was slightly pigeon-toed with her right foot; she did not require assistive devices; she had a normal cadence to her gait; and she had no issues with weight transfer or balance. Tr. 519. Skaggs' deep tendon reflexes were equal and symmetric at 2/4; she had normal right and left hand grips; normal finger to nose with eyes open and closed; normal manual dexterity; Rhomberg and Babinski were normal; and Skaggs had normal balance. Tr. 519. With the exception of slight limitations in range of motion with flexion and extension of the dorsolumbar spine, range of motion testing was normal. Tr. 522-525. Manual muscle testing was normal. Tr. 521.

Dr. Cooper's clinical impression was that:

> The claimant's physical complaints do not correlate with any of the findings that I find. Additionally, her back pain can easily be explained by her gross obesity. Her innumerable somatic complaints however, do not correlate to the clinical findings. This candidate is capable of sedentary work with no issues. No abnormal neurologic findings are found. There are no abnormal findings of the cardiovascular or pulmonary system. Her intellect is excellent as well.

Tr. 519-520.

### Reviewing physicians' opinions

On May 21, 2013, state agency reviewing physician Leon D. Hughes, M.D., completed a physical RFC assessment. Tr. 78-80. Dr. Hughes opined that Skaggs could occasionally lift/carry 20 pounds and frequently lift/carry 10 pounds; stand/walk a total of 4 hours; sit about 6 hours; and push/pull unlimitedly other than as shown for lift/carry. Tr. 78. Dr. Hughes explained that the exertional limitations were based on Skaggs' massive obesity, noting that her BMI wavered between 55 and 60. Tr. 78. Dr. Hughes also opined that Skaggs had the following postural limitations: occasional climbing ramps/stairs, stooping, kneeling, crouching, and crawling and never climbing ladders/ropes/scaffolds. Tr. 78-79. Dr. Hughes explained that the postural limitations were based on Skaggs' massive obesity and DJD.[1] Tr. 79. Dr. Hughes opined that Skaggs was limited to frequent handling and fingering due to CTS.[2] Tr. 79. Dr. Hughes also opined that Skaggs would be required to avoid hazards, i.e., unprotected heights, due to her obesity. Tr. 79-80.

---

[1] "DJD" is believed to stand for degenerative joint disease.

[2] "CTS" is believed to stand for carpal tunnel syndrome.

Upon reconsideration, on July 2, 2013, state agency reviewing physician John L. Mormol, M.D., completed a physical RFC assessment. Tr. 107-109. Dr. Mormol reached the same opinions as Dr. Hughes regarding Skaggs' limitations.[3] Tr. 107-109.

### b. Mental impairment medical opinions

#### *Consultative examining psychologist's opinion*

On August 5, 2013, consultative examining psychologist Wayne Morse, Ph.D., conducted a consultative evaluation. Tr. 526-534. Skaggs drove herself to the evaluation. Tr. 526. Skaggs' chief complaints were back pain, which started at age 7 due to a motor vehicle accident; rheumatoid arthritis, which was diagnosed at age 18 months; chronic diarrhea; and diabetes. Tr. 526-527. Skaggs indicated that her diabetes was well under control with medication but she was not taking medication due to a lack of medical insurance. Tr. 527. She reported that her pain level increases with any type of physical activity. Tr. 527. Dr. Morse noted that, in 2012, Skaggs reported having 10-12 bowel movements per day and was referred to a physician for a colonoscopy. Tr. 527. As far as activities of daily living, Skaggs reported that she has good days and bad days so her ability to perform household chores depends on how she is feeling on a particular day. Tr. 528. She reported that her symptoms had been "seriously interfering with her functioning for most of her life, but especially the past 3 years." Tr. 528. Dr. Morse observed that Skaggs had a difficult time walking and sitting due to her back problems and she shifted uncomfortably in her seat and had to stand up and walk around during the evaluation briefly to relieve her discomfort. Tr. 529. Skaggs' overall mood was depressed and anxious with a broad and appropriate affect. Tr. 529. She was very tearful when talking about her mental health

---

[3] The opinions were the same with the exception of Dr. Mormol noting that Skaggs' exertional limitations were based on her massive obesity <u>and</u> DDD in the spine, which is believed to stand for degenerative disc disease, and the postural limitations were based on Skaggs' obesity and DDD, as opposed to DJD. *Compare* Tr. 107-108 *with* Tr. 78-79.

symptoms. Tr. 529. She reported suicidal thoughts with a plan but she expressed no serious intent or sense of immediacy. Tr. 529.

Dr. Morse diagnosed major depressive disorder, recurrent, severe without psychotic features; specific phobia (situational type); post-traumatic stress disorder; dissociative disorder (not otherwise specified); learning disorder (not otherwise specified). Tr. 530. Dr. Morse opined that Skaggs' prognosis was poor, indicating that Skaggs did not feel the need for mental health treatment; her medical problems continued to deteriorate, which exacerbated her mental health issues; and without psychotherapy and psychotropic medication, it was very unlikely that her currents symptoms would improve. Tr. 531. Dr. Morse indicated Skaggs had "serious medical issues that limit her mobility and exacerbate her psychopathology." Tr. 531.

With respect to Skaggs' functional abilities, Dr. Morse opined that Skaggs would have no difficulty remembering work-like procedures and no difficulty understanding and remembering very short and simple instructions but she would have difficulty understanding and remembering detailed instructions due to her dissociative symptomatology. Tr. 532. He opined that Skaggs would have no difficulty carrying out very short and simple instructions, as well as detailed instructions but she would have considerable difficulty sustaining an ordinary routine, performing at a consistent pace, making simple work-related decisions, and completing a normal workday without frequent interruptions from her dissociative symptomatology, limited physical mobility, and anxiety. Tr. 532. Dr. Morse opined that the evidence suggested that Skaggs had great difficulty interacting with the general public due to her social anxiety and fear of men and those symptoms would significantly interfere with her ability to work in coordination with others, ask simple questions, request assistance or respond appropriately to criticism from supervisors but she would be able to maintain socially appropriate behavior and adhere to basic

standards of neatness and cleanliness. Tr. 532-533. Dr. Morse also opined that the evidence

suggested that Skaggs would be unable to respond appropriately to changes in the work setting,

set realistic goals, make plans independently of others, or engage in activities independent of

supervision or direction; she needed a great deal of assistance managing household chores and

her finances but she was able to care for her personal hygiene; and she would have considerable

difficulty managing normal, everyday work pressures. Tr. 533.

*Reviewing psychologist's opinions*

Upon reconsideration, on August 13, 2013, state agency reviewing psychologist Leslie

Rudy, Ph.D., completed a Psychiatric Review Technique ("PRT") (Tr. 104-105) and Mental

RFC Assessment (Tr. 109-111).

In the PRT, Dr. Rudy found that Skaggs would have mild restrictions in activities of daily

living; moderate difficulties in maintaining social functioning and in maintaining concentration,

persistence, or pace; and no repeated episodes of decompensation. Tr. 105. In the Mental RFC

Assessment, Dr. Rudy found no understanding and memory limitations but found some

limitations in the areas of sustained concentration and persistence, social interaction, and

adaptation. Tr. 109-110.

In the area of sustained concentration and persistence, Dr. Rudy opined that Skaggs

would be moderately limited in her ability to carry out detailed instructions; maintain attention

and concentration for extended periods; work in coordination with or in proximity to others

without being distracted by them; and complete a normal workday and workweek without

interruptions from psychologically based symptoms and to perform at a consistent pace without

an unreasonable number and length of rest periods. Tr. 109-110. Dr. Rudy explained the

limitations in concentration and pace, stating that Skaggs "has a decreased ability to complete

more complex tasks.  She would be limited to performing simple, routine tasks which do not require working at a rapid pace or meeting strict production demands."  Tr. 110.

In the area of social interaction, Dr. Rudy opined that Skaggs would be markedly limited in her ability to interact appropriately with the general public; and moderately limited in her ability to accept instructions and respond appropriately to criticism from supervisors and get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  Tr. 110.  Dr. Rudy further explained the social interaction limitations, stating that Skaggs "endorses panic symptoms and problems dealing with the public.  The [claimant] is able to interact with familiar others superficially and occasionally in a nonpublic setting."  Tr. 110.

In the area of adaptation, Dr. Rudy opined that Skaggs would be moderately limited in her ability to respond appropriately to changes in the work setting, explaining, however, that Skaggs "is able to adapt to routine changes in her job duties."  Tr. 110.

## C.    Testimonial evidence

### 1.    Plaintiff's testimony

At the hearing, Skaggs testified (Tr. 37-60) and was represented by Linda Dickman, a non-attorney representative (Tr. 15, 35, 155).  Skaggs' testimony included her description of her past employment, various treatment providers, medications, and functional abilities.  Tr. 40-60.

Skaggs indicated that, about 8 months prior to the November 13, 2014, hearing, she was without insurance and was unable to take medication for her diabetes or check her sugar on a regular basis.  Tr. 43-44, 47-48.  At the time of the hearing, she was taking her medicines regularly as prescribed.  Tr. 48.  Skaggs indicated she felt her medication helped.  Tr. 48.

Skaggs estimated being able to lift less than 10 pounds, stating she has a hard time picking up a gallon of milk.  Tr. 49.  In response to a question regarding how far she could walk,

Skaggs indicated that, if she parked in a handicap parking space at the grocery store, she would be in pain by the time she got to the front doors and would need to use a motorized shopping cart to continue her shopping.  Tr. 49.  Skaggs estimated being able to stand less than 5 minutes without holding on to anything.  Tr. 57.  She has to then sit down or lean up against a wall but cannot lean on a wall for too long because her knees and back start hurting.  Tr. 57.  Skaggs can sit longer than she can stand but she has to shift her body and change positions quite a bit and she has to get up.  Tr. 57.  She is unable to sit and watch television or a movie for a couple hours without getting up.  Tr. 57.  Skaggs loses her balance and has fallen as a result.  Tr. 58.  She has fallen up to 5 times in one month.  Tr. 58.

Skaggs is able to dress herself and take a shower but she needs to use a bath seat to take a shower because it is too hard to get up from a sitting position in the bathtub and she cannot stand too long in the shower.  Tr. 49.  Skaggs can do dishes but has to take breaks in between because the pain in her back is severe and she has to sit to relieve some of the pain.  Tr. 50.  She can fold laundry while sitting but her children have to carry the laundry baskets for her because she cannot lift the full baskets.  Tr. 50.  In 2012, Skaggs had to stop vacuuming, mopping and sweeping because the walking back and forth was aggravating her condition.  Tr. 50.  Since July 2011, Skaggs has been unable to mow the lawn, shovel snow, or rake leaves.  Tr. 50-51.  Skaggs indicated she does go grocery shopping but usually with her daughter, who carries the bags.  Tr. 51.  Skaggs is unable to go shopping at the mall unless she has her wheelchair.  Tr. 51.  Skaggs can cook but requires use of a wheelchair or kitchen chair to sit down if she has to stir something continuously.  Tr. 51.  She is able to put something in the oven and then she will sit down.  Tr. 51.  Skaggs' daughter usually makes dinner because it requires a little more time and standing.  Tr. 55.

Skaggs indicated that she had not gone swimming in the prior three years. Tr. 51-52. Skaggs indicated that she is unable to take a walk. Tr. 52. If she walks to the front door and her car, her back is usually hurting. Tr. 52. Skaggs goes out to eat about once every six months and she usually goes to religious services with her father once a week on Sundays. Tr. 53. Skaggs talks to her sister and mother on the telephone at least once a day. Tr. 55.

Skaggs enjoys writing poems. Tr. 53. She also enjoys crafts. Tr. 53. During the prior three years, the craft that she performed was painting large wood blocks while sitting. Tr. 53-54. She used to sew but stopped in 2010 because of the pain in her hands. Tr. 53-54. On average, Skaggs uses a desktop computer about 30-45 minutes a day. Tr. 54. Skaggs is able to drive and, depending on how she feels, she drives/picks up her children to/from class or work if needed. Tr. 39, 54-55.

Beginning in 2009, Skaggs started having diarrhea and she has to use the restroom 10-12 times each day because of her diarrhea. Tr. 55. Initially, when her diarrhea started, the occurrences were not as frequent as 10-12. Tr. 55. However, the frequency of her bouts with diarrhea was one of the reasons she had to stop providing daycare for children. Tr. 55. Skaggs had started to take medicine for the diarrhea about a month before the hearing and had not yet had a normal bowel movement. Tr. 55-56. Skaggs also experiences urinary incontinence. Tr. 59. She indicated she usually has daily urinary and bowel accidents. Tr. 59. Towards the latter part of the hearing, during the vocational expert's testimony, Skaggs' representative requested that Skaggs be excused because she needed to use the restroom. Tr. 64. With the agreement of Skaggs and her representative, the vocational expert's testimony continued in Skaggs' absence. Tr. 64.

Skaggs indicated that her rheumatoid arthritis mostly affects her knees and ankles, causing swelling and pain. Tr. 56. Several times a week she has swelling in her knees and ankles and it limits her mobility. Tr. 56. Skaggs' pain became so bad that she had to stop working in 2010. Tr. 57.

## 2. Vocational Expert

Vocational Expert ("VE") Joey Kilpatrick testified at the hearing. Tr. 60-69. The VE classified Skaggs' past work as: (1) store laborer, an unskilled position, classified and performed at the medium level; (2) cashier II, and unskilled position, classified and performed at the light level; (3) preschool teacher, a skilled, light level position; (4) childcare provider, an unskilled position, classified at the medium level and performed at light and medium levels; and (5) mortgage loan processor, a skilled position, classified at the sedentary level and performed at the light level. Tr. 62-63.

The ALJ asked the VE to assume an individual the same age and with the same education and work experience as Skaggs who could lift/carry 20 pounds occasionally and 10 pounds frequently; stand/walk for 4 out of 8 hours; sit for 6 out of 8 hours; unlimited pushing and pulling; no climbing ladders; occasionally climbing stairs, balancing, stooping, kneeling, crouching, and crawling; frequent fingering and handling; no exposure to hazards; limited to simple, routine tasks without strict production demands or fast pace; and occasional contact with supervisors, coworkers, and the public. Tr. 64, 65. The VE indicated that the described individual would be able to perform Skaggs' past work as a self-employed childcare provider. Tr. 65.

For the second hypothetical, the ALJ added to the first hypothetical an additional limitation, i.e., the individual would need the option to sit or stand at will without leaving the

work station.  Tr. 65-66.  The VE indicated that the second described individual would be unable to perform Skaggs' past work but there were other light, unskilled jobs in the region and nation that the described individual could perform, including (1) office helper; (2) shipping and receiving clerk; and (3) inspector for batteries.[4]  Tr. 66.  The VE explained that the customary tolerances that a typical employer would have for unexcused or unscheduled absences was one and a half days per month and the customary number and length of breaks that a typical employer would allow during the work day was between 10-15 minutes after 2 hours of work in the morning and in the afternoon and between 30-60 minutes for lunch after 4 hours of work.  Tr. 66-67.  The VE explained further that employers typically tolerate employees being off task 10% of the time.  Tr. 67.  Also, the VE indicated that employers would not tolerate an employee needing to take a 5-minute break every hour to use the restroom.  Tr. 67.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[5] . . . .

---

[4] The VE provided national and statewide job incidence data for the jobs identified.  Tr. 66.

[5] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A).

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[6] claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[7] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the

---

[6] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience. 20 C.F.R. § 404.1525.

[7] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform work available in the national economy. *Id.*

## IV. The ALJ's Decision

In her December 19, 2014, decision, the ALJ made the following findings:[8]

1.   Skaggs meets the insured status requirements through December 31, 2015. Tr. 138.

2.   Skaggs has not engaged in substantial gainful activity since July 20, 2011, the amended alleged onset date. Tr. 138.

3.   Skaggs has the following severe impairments: fibromyalgia, rheumatoid arthritis, morbid obesity, diabetes mellitus, spinal disorders, duodenitis, gastroesophageal reflux disease (GERD), and depression. Tr. 138.

4.   Skaggs does not have an impairment or combination of impairments that meets or medically equals the severity of a Listing. Tr. 138-141.

5.   Skaggs has the RFC to perform light work except she can lift and carry twenty pounds occasionally and ten pounds frequently; stand or walk for four out of eight hours; and sit for six out of eight hours. She can push and pull without limitation. She can occasionally climb stairs, balance, stoop, kneel, crouch, and crawl but she cannot climb ladders. She can frequently finger and handle. She requires the option to sit or stand at will without leaving the workstation. She cannot have any exposure to hazards. She is limited to simple, routine tasks that are not fast paced and do not have strict production demands. She is limited to occasional contact with supervisors, coworkers, and the public. Tr. 141-147.

6.   Skaggs is unable to perform any past relevant work. Tr. 147.

7.   Skaggs was born in 1974 and was 37 years, defined as a younger individual 18-49, on the amended alleged onset date. Tr. 147.

8.   Skaggs has at least a high school education and is able to communicate in English. Tr. 148.

9.   Transferability of job skills is not material to the determination of disability. Tr. 148.

---

[8] The ALJ's findings are summarized.

10.     Considering Skaggs' age, education and work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Skaggs can perform, including office helper, shipping and receiving clerk, and battery inspector.  Tr. 148-149.

Based on the foregoing, the ALJ determined that Skaggs had not been under a disability from July 20, 2011, through the date of the decision.  Tr. 149.

## V. Parties' Arguments

Skaggs challenges the ALJ's credibility assessment, arguing that the ALJ erred in her evaluation of Skaggs' statements regarding the severity, persistence and limiting effects of her fibromyalgia, musculoskeletal pain, diabetic neuropathy, diarrhea/bowel incontinence.  Doc. 16, pp. 11-20; Doc. 19.  Skaggs also argues that the ALJ erred because she did not consider Skaggs' impairments in combination.  Doc. 16, pp. 20-23.

In response, the Commissioner argues that the ALJ reasonably considered Skaggs' subjective complaints and reasonably considered all of her impairments in combination.  Doc. 17, pp. 7-17.

## VI. Law & Analysis

### A.     Standard of review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**B.    Reversal and remand is warranted because the ALJ's reasons for discounting Skaggs' credibility are not supported by the record and/or are not sufficiently explained to allow this Court the ability to determine whether the credibility assessment is supported by substantial evidence**

Skaggs challenges the ALJ's credibility assessment, arguing that the ALJ erred in her evaluation of Skaggs' statements regarding the severity, persistence and limiting effects of her fibromyalgia, musculoskeletal pain, diabetic neuropathy, diarrhea/bowel incontinence. Doc. 16, pp. 11-20; Doc. 19.

Social Security Ruling 96–7p and 20 C.F.R. § 404.1529 describe a two-part process for assessing the credibility of an individual's subjective statements about her symptoms. First, the ALJ must determine whether a claimant has a medically determinable physical or mental impairment that can reasonably be expected to produce the symptoms alleged; then the ALJ must evaluate the intensity and persistence associated with those symptoms to determine how those symptoms limit a claimant's ability to work.

When evaluating the intensity and persistence of a claimant's symptoms, consideration is given to objective medical evidence and other evidence, including: (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) precipitating and

aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) treatment, other than medication, received for relief of pain or other symptoms; (6) any measures used to relieve pain or other symptoms; and (7) other factors concerning functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c); Soc. Sec. Rul. 96–7p, *Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements*, 1996 WL 374186, at 3 (July 2, 1996) ("SSR 96-7p").[9] "An ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility. Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Calvin v. Comm'r of Soc. Sec.*, 437 Fed. Appx. 370, 371 (6th Cir. 2011) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir.1997)).

While not succinctly stated in the decision, it appears that the ALJ discounted Skaggs' subjective statements regarding the extent of her limitations due to the extent of her activities of daily living (Tr. 142), lack of support for Skaggs' stated need to use the restroom 10-12 times each day due to diarrhea (Tr. 142, 145), lack of support from objective findings in the record (Tr. 142, 144), and gaps in treatment (Tr. 142, 144). Although an ALJ's credibility assessment is generally afforded great deference, here, as explained more fully below, the ALJ's reasons for discounting Skaggs' credibility are not supported by the record and/or are not sufficiently explained to allow this Court the ability to determine whether the credibility assessment is supported by substantial evidence.

The ALJ discounted Skaggs' reports of needing to use the restroom 10-12 times per day due to digestive and gastrointestinal problems, finding that, while Skaggs indicated she needed to

---

[9] SSR 16-3p, with an effective date of March 28, 2016, supersedes SSR 96-7p. 2016 WL 1119029 (March 16, 2016); 2016 WL 1237954 (March 24, 2016).

use the restroom 10-12 times per day since 2009, she had been able to sustain work and other activities during some of that period and she "sat for an hour before requesting a restroom break" during the hearing.  Tr. 142; *see also* Tr. 145 ("Although the claimant alleges the constant need for restroom breaks, she only requested one at the hearing after sitting for more than an hour."). The ALJ's explanation is flawed for a couple reasons.

First, during the hearing, Skaggs testified that her diarrhea started in 2009 but, initially, it was not as frequent as 10-12 times per day. Tr. 55.  Also, because Skaggs did not want to put the children in her care in "harm's way," her frequent diarrhea was one of the reasons she stopped working.  Tr. 55.  Next, the ALJ's statements that Skaggs "sat for an hour before requesting a restroom break" and that "she only requested one [restroom break] at the hearing after sitting for more than an hour" are not supported by the record.  Tr. 142, 145.  The hearing commenced at 12:31 p.m. and ended at 1:32 p.m.  Tr. 35, 70.  The hearing lasted one hour and one minute but Skaggs requested a restroom break during the VE's testimony and the hearing continued on in Skaggs' absence.  Tr. 64.  Accordingly, the record does not support the ALJ's factual finding that Skaggs "sat for an hour" or "for more than an hour" before requesting a restroom break.   Rather, she needed a break before a full hour had passed.  Also, it is unclear how Skaggs' request for a restroom break during the course of a one-hour and one-minute hearing diminishes the credibility of her repeated statements that she had 10-12 bowel movements each day and required restroom breaks as a result.  *See e.g.*, Tr. 485 (9/20/2012 complaints of diarrhea, with 10-12 bowel movements per day); Tr. 429 (10/3/2012 complaints of diarrhea starting in 2010, with 10-12 stools per day); Tr. 573 (6/10/2014 emergency room visit with complaints of vomiting and diarrhea); Tr. 544-546 (8/11/2014 complaints of abdominal cramping and inability

to control bowels 10-12 times per day; reports of accidents daily as a result; diagnosis of osmotic diarrhea); Tr. 469, 482 (10/19/2012 colonoscopy performed due to diarrhea).

The ALJ's factual misstatement and/or her failure to fully support and/or explain why she found Skaggs' claimed need for 10-12 restroom breaks per day not credible is not harmless because the VE testified that an individual would not be permitted to take a 5-minute break every hour to use the restroom, since such a limitation would amount to a need to leave the workstation to take unscheduled breaks. Tr. 67-68.

The ALJ considered gaps in treatment when discussing and discounting Skaggs' conditions and determining the extent of limitations caused by those conditions. For example, when discussing Skaggs' diabetes, the ALJ stated, "As with her other impairments, the claimant went an extended period without treatment thereafter." Tr. 144. Similarly, when discussing Skaggs's gastrointestinal problems, the ALJ stated, "Further, in June 2012, the claimant went to the emergency room complaining of nausea, vomiting, and diarrhea . . . The claimant did not receive further treatment for these impairments until June 2014." Tr. 145. Also, when discussing Skaggs' mental impairments, the ALJ stated "Approximately a year later in September 2012, the claimant complained of uncontrolled depression . . . There is a large gap in treatment or even reference to depression problems until June 2014." Tr. 145. The Commissioner argues that the ALJ noted gaps in treatment but did not draw a negative inference from or discount Skaggs' credibility due to gaps in Skaggs' treatment, which were due to a lack of insurance at times. However, considering the ALJ's repeated focus on gaps in treatment, without a more complete analysis by the ALJ as to whether and how the ALJ took into account the reason for gaps in treatment, i.e., lack of insurance, the Court is unable to conclude that the ALJ did not draw a negative inference from gaps in treatment and/or that the credibility

assessment is supported by substantial evidence. *See* SSR 96-7p ("[T]he adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment.").

Additionally, the ALJ discounted Skaggs' credibility based on her activities of daily living, concluding that one of her activities of daily living was walking for exercise. Tr. 142. However, there is no record citation noted by the ALJ to support her conclusion that Skaggs walks for exercise and the hearing transcript record contradicts the ALJ's conclusion in this regard. For example, during the hearing, when Skaggs was asked about her doctor's exercise recommendations, she indicated she was unable to take a walk and did not have access to a pool to try to swim. Tr. 51-52. Additionally, while it is not for this Court to reweigh the evidence, considering the limitations that Skaggs indicated she had while performing daily activities, e.g., needing help doing laundry, usually going to the grocery store with her daughter so she can help lift items, going out to eat but maybe only once every six months, taking no trips in the last three years (Tr. 50, 51, 53), the ALJ should have more clearly explained and/or supported her conclusion that Skaggs leads a "rather active life" and that she is "very social" (Tr. 142). *See e.g., Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248-249 (6th Cir. 2007) (finding flaws with the ALJ's credibility assessment where the ALJ concluded that the claimant was "fairly active" but did not examine the claimant's actual ability to perform her daily activities).

The ALJ also discounted Skaggs' credibility on the basis that her statements were not supported by objective findings in the record. Tr. 142, 144. However, considering that one of Skaggs' severe impairments is fibromyalgia (Tr. 138), the ALJ's reliance upon a lack of

objective findings to discount Skaggs' credibility (Tr. 142, 144) is problematic. As indicated by the Sixth Circuit, fibromyalgia "is a medical condition marked by 'chronic diffuse widespread aching and stiffness of muscles and soft tissues.'" *Rogers*, 486 F.3d at 244, n.3 (quoting *Stedman's Medical Dictionary for the Health Professions and Nursing* at 541 (5th ed. 2005)). Further, the Sixth Circuit has recognized that fibromyalgia can result in a disability. *See, e.g., Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 818 (6th Cir. 1988). Nevertheless, fibromyalgia presents challenges in the disability analysis because, "unlike medical conditions that can be confirmed by objective testing, fibromyalgia patients present no objectively alarming signs." *Rogers*, 486 F.3d at 243; *see also Swain v. Comm'r of Soc. Sec.*, 297 F.Supp.2d 986, 990 (N.D. Ohio 2003) ("Fibromyalgia is an 'elusive' and 'mysterious' disease. It has no known cause and no known cure."). In other words, objective medical evidence corroborating allegations of pain caused by fibromyalgia is often nonexistent. *See Id.* In this regard, the Sixth Circuit has recognized that, for claims based on fibromyalgia, the cause of the disability is not the underlying condition itself but, rather, the symptoms associated with the condition -- including complaints of pain, stiffness, and fatigue. *Rogers*, 486 F.3d at 247.

For the reasons set forth herein, the Court finds that reversal and remand is warranted because the ALJ's reasons for discounting Skaggs' credibility are unsupported by the record and/or not sufficiently explained to allow this Court the ability to determine whether the credibility assessment is supported by substantial evidence. Notwithstanding the Court's reversal of the Commissioner's decision based on a flawed credibility assessment, the Court notes that, despite the unique nature of the impairment, a "diagnosis of fibromyalgia does not automatically entitle [a claimant] to disability benefits." *Vance v. Comm'r of Soc. Sec.*, 260 Fed. App'x 801, 806 (6th Cir. 2008). Accordingly, while remand is necessary for a more thorough

credibility analysis, Skaggs' diagnosis of fibromyalgia alone does not automatically entitle her to a finding of disabled on remand.

Skaggs also argues that remand is required because the ALJ did not consider her impairments in combination. Since a new and more thorough credibility assessment may impact the disability determination analysis as a whole, the Court declines to address this argument. On remand, the ALJ shall conduct a more thorough credibility assessment consistent with this opinion and consider anew all of Skaggs' impairments, both severe and non-severe, alone and in combination, and the functional limitations posed by those impairments that are determined to be supported by the evidence.

## VII. Conclusion

For the reasons set forth herein, the Court **REVERSES and REMANDS** the Commissioner's decision for proceedings consistent with this opinion.


Dated: June 15, 2017

_____
Kathleen B. Burke
United States Magistrate Judge